IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN HAUSER,                          :        CIVIL ACTION NO. **1:CV-08-0749**
                                      :
   Plaintiff                  :         (Judge Caldwell)
                                      :
   v.                         :        (Magistrate Judge Blewitt)
                                      :
MICHAEL J. ASTRUE,                    :
Commissioner of                       :
Social Security,                      :
                                      :
   Defendant                  :

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g), wherein the

Plaintiff, Joan Hauser, is seeking review of the decision of the Commissioner of Social Security,

("Commissioner"), that denied her claim for Disability Insurance Benefits, ("DIB"), pursuant to

Title II of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433.


I.       **PROCEDURAL HISTORY.**

The Plaintiff protectively filed an application for DIB on December 9, 2004, alleging

disability since November 1, 2004.  (R. 19, 20, 62).  The Plaintiff acquired enough quarters of

coverage to remain insured through December 31, 2009.  (R. 21).  The state agency denied her

claim initially and she filed a timely request for a hearing.  (R. 19).  A hearing was held before an

Administrative Law Judge, ("ALJ"), on May 10, 2006.  (R. 19, 257).  At the hearing, the Plaintiff,

represented by counsel, and a vocational expert, ("VE"), testified.  (R. 257).  The Plaintiff was

denied benefits pursuant to the ALJ's decision of June 1, 2006.  (R. 45-51).  The Plaintiff

requested review of the hearing decision and this request was granted.  (R. 19).  The Appeals

Council vacated the June 1, 2006 decision and remanded the case for further proceedings.  (R.

19).  On January 3, 2007, a supplemental hearing was held.  (R. 19, 279).  At the hearing, the

Plaintiff and a vocational expert testified.  (R. 19, 279).  The Plaintiff was represented by

counsel.  (R. 19, 279).  The Plaintiff was again denied benefits pursuant to the ALJ's decision of

January 18, 2007.  (R. 30).

The Plaintiff requested review of the ALJ's decision.  (R. 15).  The Appeals Council

denied her request on February 28, 2008, thereby making the ALJ's decision the final decision

of the Commissioner.  (R. 7-9).  42 U.S.C. § 405(g).

In compliance with the Procedural Order issued in this matter, the parties have filed

briefs in support of their respective positions.  (Docs. 10 and 12).

## II.     STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial

is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988);

*Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence "does not mean a large or

considerable amount of evidence, but rather such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988);

*Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).  It is less than a preponderance of the

evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III.    DISABILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520.  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  *See* 20 C.F.R. § 404.1520.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether

the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. § 404.1520.

In the present matter, the ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Act.  (R. 19-30).  At step one, the ALJ found that the Plaintiff has not engaged in substantial gainful work activity since her alleged disability onset date, November 1, 2004.  (R. 21).  At step two, the ALJ concluded that the Plaintiff's post traumatic stress disorder, major depressive disorder, recurrent, moderate to severe with psychotic features, and anxiety disorder were "severe" impairments within the meaning of the Regulations.  (R. 21).

At step three, the ALJ found that the Plaintiff does not have an impairment, or combination or impairments, severe enough to meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.  (R. 22).  At step four, the ALJ found that the Plaintiff is not able to perform any of her past relevant work.  (R. 28).  At step five the ALJ found that the Plaintiff does not have any exertional limitations and has the mental residual functional capacity, ("RFC"), to perform unskilled work which does not require involvement with the general public on a continuous basis.  (R. 22-28). Thus, the ALJ determined that the Plaintiff has not been under a disability, as defined in the Act, from November 1, 2004, her disability onset date, through the date of the decision.  (R. 30).

## IV.    BACKGROUND.

The Plaintiff was born on December 18, 1952 and was fifty-three (53) years old at the time of the ALJ's original decision, and was fifty-five (55) years old at the time of the ALJ's second decision.  (R. 258, 273).  Therefore, she is considered a person approaching advanced age under the Regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).

The Plaintiff completed highschool and earned a license to practice practical nursing in Pennsylvania.  (R. 258-59).  She has past relevant work experience as a licensed practical nurse.  (R. 273).

The Plaintiff does not do the house cleaning or laundry in her home.  (R. 262). She testified that she hired a housekeeper who comes two to three times per week and that her husband also does housework.  (R. 262).  She is able to drive, but mostly stays home during the day.  (R. 271).  Although the Plaintiff is able to physically perform activities of daily living, her depression and other mental impairments make it difficult for her to accomplish tasks.  (R. 285-86).  The Plaintiff testified that there are days when she does not shower, does not comb her hair, or brush her teeth.  (R. 285-86).  She also testified that there are clusters of days when she can not get out of bed and that this occurs at least two days out of every week.  (R. 285).  There are days every week where the Plaintiff never leaves the house.  (R. 285-86).

The Plaintiff experiences panic attacks and the sensation that the floor is dropping out from under her.  (R. 267).  During the panic attacks, the Plaintiff experiences heart palpitations, nausea and shortness of breath.  (R. 267).  The Plaintiff suffers from

forgetfulness, irritability, lack of physical strength, fatigue and nausea from anxiety and medication.  (R. 260-63).  The irritability the Plaintiff experiences has caused problems with her family relationships.  (R. 263).  She also has difficulty maintaining concentration. (R. 260-63).   As a result of having difficulty maintaining concentration, the Plaintiff has a difficult time keeping task.  (R. 264).  She testified that she becomes obsessed with her medical condition.  (R. 268).  For instance, the Plaintiff convinced herself at different times that she had liver disease and brain tumors.  (R. 268).  Also as a result of her mental impairments she has difficulty being around her grandchildren because she worries that something is wrong with them.  (R. 269-70).

The Plaintiff has been treated for depression since the 1970s and was hospitalized twice due to her depression, once in 1978 and once in 1980.  (R. 264, 266).  The Plaintiff has seen a medical doctor, multiple therapists and a psychiatrist to treat her mental conditions.  (R. 265).  The Plaintiff treats her condition with therapy and medication.  (R. 266).  She takes Topamax, Klonopin, and Cymbalta to manage her symptoms.  (R. 266).

Vocational expert, Gerald Keating, testified based on the *Dictionary of Occupational Titles*.  (R. 273-75).  In response to the ALJ's hypotheticals, the VE stated that the Plaintiff would be able to perform work as a material handler, packer and store laborer.  (R. 273-74).

V.    **DISCUSSION.**

   A. ***Whether the ALJ erred in failing to give controlling weight to the opinions of three treating sources***

6

The Plaintiff argues that the ALJ erred by failing to accord the opinion of her treating sources great weight in determining the Plaintiff's RFC.  (Doc. 10 at 7-8).  The Plaintiff argues that the ALJ afforded little weight to the opinions of her treating sources, and relied instead on the opinion of a non-examining consultative source in deciding that the Plaintiff can engage in unskilled work.  (Doc. 10 at 7-8).  The Plaintiff states that the treating sources provided "entirely credible opinions based upon multiple evaluations and follow-up treatment appointments, medication regimes and counseling." (Doc. 10 at 8).  The Defendant argues that the ALJ gave appropriate weight to the opinions of the treating sources.  (Doc. 12 at 9).  The Defendant asserts that the opinions of the two treating physicians were properly given little weight because their opinion that the Plaintiff could not work was not supported by their treatment notes and the medical record.  (Doc. 12 at 11-12).

An ALJ must accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994); *Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991); *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986).  Where the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong

reason." *Plummer*, 186 F.3d at 429 (citing *Mason*, 994 F.2d at 1066).  The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  *See Adorno*, 40 F.3d at 48.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.  *Plummer*, 186 F.3d at 429; *Frankenfield*, 861 F.2d at 408; *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983).

The ALJ is required to evaluate every medical opinion received.  20 C.F.R. § 404.1527(d).  Although he must consider all medical opinions, the better an explanation a source provides for an opinion, particularly through medical signs and laboratory findings, the more weight the ALJ will give that opinion.  20 C.F.R. § 404.1527(d)(3).  While treating physicians' opinions may be given more weight, there must be relevant evidence to support the opinion.  20 C.F.R. § 404.1527(d).  Automatic adoption of the opinion of the treating physician is not required.  *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

"The only reasons for an ALJ to reject a treating physician's opinion are 'on the basis of contradictory medical evidence,' or if the opinion is unsupported by medical data." *Kurilla v. Barnhart,* 2005 WL 2704887, at *5 (E.D. Pa. Oct. 18, 2005) (quoting *Plummer,* 186 F.3d at 429 and citing *Newhouse v. Heckler,* 753 F.2d 283 (3d Cir. 1985).  Here, the ALJ rejected the opinions of Dr. Calvert and Dr. Philippen regarding the

Plaintiff's limitations. (R. 27-28). Both Dr. Calvert and Dr. Philippen considered the Plaintiff disabled and not capable of engaging in employment. (R. 149, 234, 246). The ALJ found that Dr. Calvert's opinion was not supported by her progress notes and that Dr. Philippen's opinion deserved little weight because "the record fails to document the basis for his diagnostic conclusions or opinions" and is "devoid of any enlightening examination or progress notes which document the basis of the conclusions and opinions expressed." (R. 27).

Although the ALJ states that he gave the opinions of Dr. Calvert and Dr. Philippen "little weight", it is clear that he rejected them and relied upon the opinion of the non-examining State Agency medical consultant in determining the Plaintiff's RFC. (R. 27-28). Dr. Calvert, a psychiatrist, has treated the Plaintiff for her mental health impairments since October of 2004. (R. 143, 149-53, 198-206, 230-33, 235-46). Dr. Philippen, a psychologist, has treated the Plaintiff since July 2006. (R. 234, 242).

The State Agency medical consultant, who never examined the Plaintiff, determined that the Plaintiff retains the RFC for unskilled work and "appears able to function in a work setting." (R. 194). The ALJ noted the State Agency medical consultant's findings that the Plaintiff was "markedly limited in her ability to carry out detailed instruction and to interact appropriately with the general public, moderately limited in her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without

9

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to respond appropriately to changes in the work setting but has no other significant limitation resulting from her impairments." (R. 28, R. 178-95). The ALJ noted that the State Agency medical consultant determined that the Plaintiff's impairments only mildly restrict her activities of daily living, moderately restricted maintaining social functioning and moderately restricted her ability to maintain concentration, persistence or pace. (R. 28, 178-95). The State Agency medical consultant also indicated that the Plaintiff suffered no episodes of decomposition and that she retained the residual mental capacity to engage in unskilled work. (R. 28, 178-95). The ALJ found that this opinion was supported by and consistent with the record and accorded it great weight and adopted it. (R. 28).

The ALJ does not discuss how this opinion is consistent with the medical record and does not point to anything in the medical record to support it. Instead, the ALJ discredits the opinions of the two treating sources by finding that the progress and treatment notes of those sources do not support their ultimate opinions that the Plaintiff is disabled. (R. 27-28). Upon review of those progress and treatment notes, we find that the ALJ's finding is incorrect and that the record evidence does not support the decision of the non-examining State Agency medical consultant.

In choosing to reject the opinions of both of Dr. Calvert and Dr. Philippen, the ALJ mischaracterized the progress notes and made speculative inferences from the

progress notes on which he based his decision.  The ALJ noted that Dr. Calvert's treatment notes "show that the claimant's mental status has not worsened since she stopped working."  However, Dr. Calvert has never indicated this, and, in fact, her treatment notes show that the Plaintiff has periods where she feels better, followed by periods of decline.  (R. 149-53, 199-206, 236-41).  For example, on February 28, 2006, Dr. Calvert noted that the Plaintiff stated that she thought she was "managing [herself] better" and that she seemed calm and alert.  (R. 236).  The Plaintiff's mood was euthymic and was "better".  (R. 236).  Dr. Calvert also reported that sudden noises cause the Plaintiff irritation and that she takes up to three (3) Klonopin daily.  (R. 236).  Dr. Calvert explained that Klonopin is "strictly an agent to help calm anxiety symptoms."  (R. 230).  At her next appointment with Dr. Calvert, on April 18, 2006, Dr. Calvert reported that the Plaintiff's mood was constricted and depressed and that the Plaintiff reported bad dreams.  (R. 237).  Dr. Calvert noted that the Plaintiff reported being "really nasty in the last 2 weeks".  (R. 237).

The ALJ noted that "[a]lthough the claimant initially complained of irritability, decreased energy, crying spells and intrusive thoughts, her mental status stabilized within 12 months of onset after her medications were adjusted."  This characterization of Dr. Calvert's treatment notes is not accurate.  Dr. Calvert never indicates that the Plaintiff's mental status had stabilized within 12 months of onset after medication adjustment.  Dr. Calvert's treatment notes and April 26, 2006 letter to the Plaintiff's attorney indicate that the opposite is true.  In her April 26, 2006 letter, Dr. Calvert states the following:

> My diagnosis, after my initial evaluation. . .was Posttraumatic Stress disorder.
>  . . .
> Patients with Posttraumatic Stress disorder *frequently struggle with mood instability, particularly irritability*, low stress tolerance and difficulty getting along with others.  *Due to waxing and waning anxiety symptoms,* which usually occur on a daily basis, concentration is often poor.
>  . . .
> [The Plaintiff's] reported symptoms are certainly consistent with the diagnosis of PTSD and her symptoms are frequently severe.

(R. 230)(Emphasis added).  This letter, written almost two years after the Plaintiff's onset date, shows that the Plaintiff's condition is not "stabilizing" or getting better.  The letter shows that the Plaintiff's condition has been unstable and that her symptoms "wax and wane", which indicates that she will have good days followed by bad days.

The ALJ considered the thorough diagnosis and medical source statement of Dr. Philippen and determined that Dr. Philippen's opinion was entitled to "little weight as the record fails to document the basis for his diagnostic conclusions or opinions. . . .[t]he record is devoid of any enlightening examination or progress notes which document the basis for the conclusions and opinions expressed."  (R. 27).  However, in his own summary of Dr. Philippen's medical source opinion, the ALJ notes the basis for Dr. Philippen's diagnostic conclusions.  For instance, the ALJ noted that Dr. Philippen formed his opinion of the Plaintiff's conditions throughout 12 sessions of cognitive/behavioral psychotherapy.  (R. 26).  The first session took place on July 18, 2006.  (R. 26).  The ALJ pointed out that in July 2006, Dr. Philippen "administered the Minnesota Multiphasic Personality (M.M.P.I.-2) and the Beck Depression Inventories" and reported that "both scales indicate depression at the extreme level."  (R. 25).

Further, the ALJ noted that on July 25, 2006, Dr. Philippen assigned the Plaintiff a GAF score of 43, and on December 11, 2006, Dr. Philippen assigned a GAF score of 47.[1] (R. 25-26, 234, 242).

Dr. Philippen thoroughly explains his basis for diagnosis in two letters. (R. 234). In a July 25, 2006 letter, Dr. Philippen states the following:

> This letter is written at the request of [the Plaintiff] to describe diagnostic impressions and provide interpretation of recently administered psychometric scales. [The Plaintiff] has experienced interpersonal dysfunction throughout her adult life. She has participated in an array of mental health services including extended psychotherapy, psychotropic and psychiatric treatment and, on one occasion, impatient hospitalization.
>
> The Minnesota Multiphasic Personality (M.M.P.I. -2) and Beck Depression Inventories were administered in July 2006. Both scales indicate levels of depression in the extreme range. Current depressive symptoms include disturbance in sleep and appetite, loss of pleasure in preferred activities, tearful sadness and suicidal thoughts (without intention or plan). In addition to depression, the M.M.P.I. profile reflects high levels of anxiety, disordered thought processes, and psychosomatic concerns. The results of this measure are considered to provide valid estimates of [the Plaintiff's] functioning despite an atypical response pattern.

(R. 234). In the letter, Dr. Philippen lists his diagnostic impressions: major depressive disorder, recurrent, severe with psychotic features; anxiety disorder not otherwise specified; post traumatic stress disorder, chronic, with delayed onset; personality disorder not otherwise specified; sedentary lifestyle; occupational problems, problems with primary support group. (R. 234).

---

[1] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

In the second letter, dated December 11, 2006, Dr. Philippen states the following:

> [The Plaintiff] was self referred for psychological services and initially seen on July 18, 2006.  Assessment and treatment were requested during a period of incapacity which continues to the present time. [The Plaintiff] suffers from significant symptoms of depression, anxiety and disordered thought processes.  She reports ongoing effects of traumatic experiences suffered during early life.

> [The Plaintiff] has participated in twelve sessions of cognitive/behavioral individual psychotherapy to reduce episodes of panic, increase participation in social activities and improve interpersonal relations with family members and others in the community.  To date, [the Plaintiff] has shown slight improvement in mood and interpersonal coping.  She continues to experience high levels of anxiety and maintains some of the avoidance behaviors that sustain her discomfort and susceptibility to panic.

(R. 242).

The Plaintiff's treating therapist, Ms. Crouse-Novak, a licensed clinical social worker, submitted a summary of her sessions with the Plaintiff in February of 2005.  (R. 221).  This summary supports the opinions of Dr. Calvert and Dr. Philippen.  Ms. Crouse-Novak has treated the Plaintiff weekly since July 27, 2004.  (R. 221).  She reports that the Plaintiff suffers from severe anxiety and has been prescribed Klonopin by her primary care physician.  (R. 221).  The Plaintiff reported to Ms. Crouse-Novak that she has intrusive thoughts "centering on themes of loved ones or herself being killed in violent car crashes."  Ms. Crouse-Novak indicates that the Plaintiff denied suicidal or homicidal ideation, but reported paranoid thoughts and occasionally visual and olfactory hallucinations that occurred when she used to work.  (R. 221).  The Plaintiff told Ms. Crouse-Novak that when she was working, she would have thoughts that others were

talking about her and had anxiety about forgetting part of what she was expected to do. (R. 221).  Ms. Crouse-Novak noted that the Plaintiff felt like the floor was dropping out from under her when she was at work and would become so anxious that she would vomit.  (R. 221).

Ms. Crouse-Novak stated that the Plaintiff's behavior at home has deteriorated to the point where she has many days that she is unable to get dressed or perform any household duties.  (R. 221).  The Plaintiff told her that her husband must leave lists for her and that a woman comes into the home to help twice per week.  (R. 221).  The Plaintiff indicated to Ms. Crouse-Novak that she is unable to finish most tasks that she begins because they become too overwhelming, even with projects that she usually enjoys.  (R. 221).

The therapist reported that the Plaintiff was hospitalized twice, in 1974 and 1980, for severe depression and has been on various medications to treat her mental health condition ever since.  (R. 221).  Ms. Crouse-Novak noted that the Plaintiff has been in and out of outpatient therapy since the early 1980s and has participated in a partial hospitalization program.  (R. 221).  Ms. Crouse-Novak's progress notes, like Dr. Calvert's, indicate that the Plaintiff's symptoms wax and wane in that she will have good days, followed by deterioration in her condition.  (R. 207-21).

In rejecting Dr. Calvert's and Dr. Philippen's opinions, the ALJ did not point to contradictory medical evidence.  Also, the ALJ's finding that the treating sources' opinions are unsupported by medical evidence is inaccurate, especially considering the

15

extensive treatment history the Plaintiff has with Dr. Calvert and the two letters from Dr.

Philippen.  We find that the ALJ's decision to give "little weight" to the treating sources'

opinions is not supported by substantial evidence and that the treating sources' opinions

were entitled to "great weight".

### B.  Whether the ALJ erred in determining that the Plaintiff was not entirely credible

The Plaintiff argues that the ALJ erred in concluding that her subjective complaints

were not entirely credible.  (Doc. 10 at 9-11).  Specifically, the Plaintiff argues that the

ALJ's credibility determination was not based on substantial evidence.  (Doc. 10 at 9-11).

She asserts that the ALJ mischaracterized the Plaintiff's testimony, as well as relied on

isolated activities of daily living as opposed to considering the record as a whole.  (Doc.

10 at 9).  The Defendant contends that the ALJ properly found that the objective medical

evidence does not support the Plaintiff's subjective complaints.  (Doc. 12 at 12).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded

great weight and deference, particularly since an ALJ is charged with the duty of

observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.*,

127 F.3d 525, 531 (6th Cir.1997); *see also  Casias v. Secretary of Health & Human Servs.*,

933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual

optimally positioned to observe and assess witness credibility.')."  *Frazier v. Apfel*, 2000

WL 288246 (E.D.Pa. March 7, 2000).  "The ALJ must indicate in [her] decision which

evidence [she] has rejected and which [she] is relying on as the basis for [her] finding."

*Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).  An ALJ may find

testimony to be not credible, but she must "give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." *Id*.

The ALJ found that the Plaintiff's "medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that once again the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 26). The ALJ also found that the Plaintiff's allegations concerning her symptoms were inconsistent with her activities of daily living and functional abilities. The ALJ found that despite the Plaintiff's symptoms, she is able to perform a broad range of activities of daily living, including cooking, shopping, reading, watching television, visiting friends and relatives and taking two vacations.

There is a distinction between exertional and non-exertional limitations. Here, the Plaintiff is not alleging exertional limitations, but is claiming non-exertional limitations as a result of her mental health impairments. This distinction is discussed in 20 C.F.R. § 404.1569a. Under that section, "[t]he classification of a limitation as exertional is related to the United States Department of Labor's classification of various jobs by various exertional levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing and pulling." 20 C.F.R. § 404.1569a(a). When the restrictions affect the claimant's ability to meet job demands other than strength demands, the limitations are non-exertional. Examples of non-exertional limitations are difficult functioning because of nervousness, anxiety,

17

depression, difficulty seeing, hearing, maintaining concentration and remembering.  20

C.F.R. § 404.1569a(c).  In this case, the Plaintiff alleges only non-exertional limitations.

The ALJ's credibility determination is flawed.  In his decision, the ALJ seems to use

evidence that the Plaintiff is physically able to perform exertional activities of daily living

to discredit her testimony of her non-exertional limitations resulting from her mental

health impairments.  The Plaintiff does not claim that she is not physically capable of

cooking or vacuuming, but that her mental health impairments, including depression,

PTSD and anxiety, make it difficult for her to perform and finish such tasks.  The ALJ

mischaracterized her testimony about her activities of daily living.  While it is true that

the Plaintiff testified that she is able to engage in a broad range of daily activities, she also

testified that there a few days every week where she does not leave the house, get out of

bed or perform personal grooming.  The Plaintiff testified that her husband and a

housekeeper do the housework and that she sometimes accompanies her mother-in-law

to the grocery store.  (R. 262).  She also testified that she is able to make soup and turn

on the vacuum cleaner, but that her concentration problems make it difficult to "stay[]

on task with things, and to do it on a consistent basis."  (R. 263).

The ALJ did not find credible the Plaintiff's testimony that personal grooming is

not important to her anymore and that there are days when she does not engage in a

personal grooming regimen because there was no mention of an issue with personal

grooming in the medical records.  (R. 26-27).  The ALJ points out that the progress notes

from Dr. Calvert indicate that the Plaintiff was neat in appearance and appeared to be

adequately groomed at each session.  (R. 27).  The fact that the Plaintiff appeared well groomed and neat at a doctor's appointment once or twice a month does not contradict the Plaintiff's testimony that personal grooming is no longer that important to her and that she sometimes does not brush her teeth or get a shower.  It simply shows that the Plaintiff manages to engage in personal grooming to attend a doctor's visit once or twice a month.

The ALJ also relied on the fact that the Plaintiff went on a vacation to California in May 2005 and to Europe in April of 2006 to determine that her activities of daily living did not support her symptom allegations.  (R. 26).  We disagree that these two vacations contradict the Plaintiff's allegations of symptoms.  In *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981), the Court stated that "shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days. . .[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."  *Id.*

The medical evidence, as discussed earlier, clearly supports the Plaintiff's claims of symptoms.  In both hearings, the Plaintiff testified that she has difficulty getting along with others, performing and finishing tasks, and loses concentration easily.  She testified that she has at least two days per week that she does not get out of bed and that has problems getting along with others.  The treatment notes and opinions of Dr. Calvert and Dr. Philippen strongly support the Plaintiff's testimony.  In fact, it is apparent from

19

reviewing the Plaintiff's hearing transcript that she had difficulty answering the questions of the ALJ and the attorney, and frequently asked her attorney to ask the question a second time.  This supports her testimony that she has difficulty concentrating and staying on task.  The ALJ gave only "little weight" to the Plaintiff's treating sources and gave great weight to a non-examining State Agency medical consultant, who opined that the Plaintiff was capable of performing unskilled work.  (R. 28).  However, as discussed earlier, we found that the ALJ erred in failing to accord the opinions of the treating sources great weight.

Accordingly, we find that substantial evidence does not support the ALJ's credibility determination regarding the Plaintiff's subjective complaints of symptoms.  The ALJ's disability determination is not supported by substantial evidence because he failed to give appropriate weight to two treating sources and erred in his credibility determination.  In choosing to remand the SSA's decision under 42 U.S.C. § 405(g), the court may choose to remand to the SSA for a further hearing, or may direct the payment of benefits.  *See Brownawell v. Astrue*, — F.3d —, No. 07-4405, 2008 WL 5147953, at *4 (3d Cir. Dec. 9, 2008).  The decision to direct the payment of benefits "should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 221 (3d cir. 1984).  "Such a decision is especially appropriate when the disability determination process has been delayed due to factors beyond the claimant's control."

*Id.* Here, the ALJ determined at the fifth step of the disability determination process that the Plaintiff was capable of performing unskilled work.  The ALJ made this determination despite the fact that two treating sources opined that the Plaintiff is disabled.  The only support for the ALJ's determination was the non-examining State Agency medical consultant and the fact that the ALJ found the Plaintiff's testimony not credible.  As discussed, we found that the opinions of the two treating sources should have been given great weight, and the State Agency medical consultant's opinion should have been given minimal weight.

The Plaintiff's case was filed almost five years ago.  Since then, the Plaintiff has had two hearings before the same ALJ, where more evidence was admitted, and now has the present appeal.  The record in this case is unlikely to change and there is substantial evidence on a fully developed record to indicate that the Plaintiff is disabled.  *See id.* (directing the District Court to enter an order granting the payment of benefits to the Plaintiff after an eight year period that included two hearings before an ALJ, two petitions to the appeals council, two appeals to District Court and the final appeal to the Circuit Court of Appeals).  Accordingly, we recommend that an order directing payment of benefits be entered.

We have considered the Plaintiff's argument that the ALJ did not comply with the Appeals Council's directions on remand, and, in light of the preceding discussion, conclude that we need not address this argument at this time.

**VI.      RECOMMENDATION.**

Based upon the foregoing, it is respectfully recommended that the Plaintiff's

appeal be **GRANTED.**


                                         s/ Thomas M. Blewitt
                                        **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**


**Dated: March 25, 2009**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


JOAN HAUSER,                          :         CIVIL ACTION NO. **1:CV-08-0749**
                                      :
   Plaintiff                          :          (Judge Caldwell)
                                      :
   v.                                 :         (Magistrate Judge Blewitt)
                                      :
MICHAEL J. ASTRUE,                    :
Commissioner of                       :
Social Security,                      :
                                      :
   Defendant                          :

## <u>NOTICE</u>

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **March 25, 2009.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within ten (10)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis
of that record.  The judge may also receive further evidence, recall
witnesses or recommit the matter to the magistrate judge with
instructions.


                                        <u>s/ Thomas M. Blewitt</u>
                                        **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**


**Dated: March 25, 2009**